## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DOMINIC STIMMA, MARGOTH STRAND, and JYNONA GAIL LEE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TORRENT PHARMA, INC., HETERO USA INC., CAMBER PHARMACEUTICALS INC., THE KROGER CO., QUALITY FOOD CENTERS, INC., CVS HEALTH CO. f/k/a CVS CAREMARK, and WAL-MART STORES, INC.,<br><br>Defendants. | Civil Action No.<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Dominic Stimma, residing at 2D Stonegate Circle, Branford, Connecticut 96405,  Margoth Strand, residing at 2221 Gilman Drive West, Unit 402, Seattle, Washington, and Jynona Gail Lee, residing at 354 Readwell Drive, San Antonio, Texas 78220 (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants Torrent Pharma, Inc. ("Torrent"), having its principal place of business at 150 Allen Road, Basking Ridge, New Jersey 07920, Hetero USA Inc. ("Hetero"), having its principal place of business at 1035 Centennial Avenue, Piscataway, New Jersey 08854, Camber Pharmaceuticals Inc. ("Camber"), having its principal place of business at 1031 Centennial Avenue, Piscataway, New Jersey 08854, The Kroger Co. ("Kroger"), having its principal place of business at 1014 Vine Street, Cincinnati, Ohio 45202, Quality Food Centers, Inc. ("QFC"), having its principal place of business at 10116 NE 8th Street, Bellevue, Washington 98004, CVS Health Co. f/k/a CVS Caremark ("CVS"), having its principal place of business at One CVS Drive, Woonsocket,

1

Rhode Island 02895, and Wal-Mart Stores, Inc. ("Walmart"), having its principal place of

business at 702 Sw 8th Street, Bentonville, Arkansas 72716 (collectively, "Defendants").

Plaintiffs make the following allegations pursuant to the investigation of their counsel and based

upon information and belief, except as to the allegations specifically pertaining to themselves,

which are based on personal knowledge.

## NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.      This is a class action lawsuit regarding Defendants Torrent, Hetero, and Camber's

manufacturing and distribution of valsartan-containing generic prescription medications

contaminated with N-nitrosodimethylamine ("NDMA"), a carcinogenic and liver-damaging

impurity.  In turn, Defendants Kroger, QFC, CVS, and Walmart sold this contaminated generic

medication to Plaintiffs and other similarly-situated consumers.

2.      Originally marketed under the brand name Diovan, valsartan is a prescription

medication mainly used for the treatment of high blood pressure and congestive heart failure.

However, due to manufacturing defects originating from overseas laboratories in China and

India, certain generic formulations have become contaminated with NDMA.

3.      NDMA is a semivolatile organic chemical.  According to the U.S. Environmental

Protection Agency, NDMA "is a member of N-ni-trosamines, a family of potent carcinogens."

While NDMA is not currently produced in the United States other than for research purposes, it

was formerly used "in production of liquid rocket fuel," among other uses.  NDMA is listed as a

"priority toxic pollutant" in federal regulations.  *See* 40 CFR § 131.36.  Exposure to NDMA,

such as through the contaminated valsartan medications, can cause liver damage and cancer in

humans.  NDMA is classified as a probable human carcinogen, and animal studies have shown

that "exposure to NDMA has caused tumors primarily of the liver, respiratory tract, kidney and

blood vessels."

4.      On July 13, 2018, the U.S. Food & Drug Administration ("FDA") announced a voluntary recall of several brands of valsartan-containing generic medications.  The recall traced back to a Chinese company, Zhejiang Huahai Pharmaceuticals, which supplied the active pharmaceutical ingredient, valsartan, to American subsidiaries, as well as other companies such as Torrent.  The recall was due to the presence of NDMA in the recalled valsartan products.  The FDA's notice states that "NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests.  The presence of NDMA was unexpected and is thought to be related to changes in the way the active substance was manufactured."  The FDA is "investigating the levels of NDMA in the recalled products, assessing the possible effect on patients who have been taking them and [determining] what measures can be taken to reduce or eliminate the impurity from future batches produced by the company."

**A.  Torrent failed to promptly recall its valsartan medications, despite the fact that Torrent sourced valsartan directly from Zhejiang Huahai Pharmaceuticals.**

5.      After the first wave of recalls, on August 17, 2018, Defendant Torrent's parent company, Torrent Pharmaceuticals Limited, issued a voluntary recall of fourteen (14) lots of Valsartan/Amlodipine/HCTZ tablets "to the consumer level due to the detection of trace amounts of an unexpected impurity found in an active pharmaceutical ingredient ('API') manufactured by Zhejiang Huahai Pharmaceuticals.  The impurity detected in the API is N-nitrosodimethylamine (NDMA), which is a substance that occurs naturally in certain foods, drinking water, air pollution, and industrial processes, and has been classified as a probable human carcinogen as per International Agency for Research on Cancer (IARC) classification."

6.      Inexplicably, Torrent Pharmaceuticals Limited, acting in concert with its American subsidiary, Defendant Torrent, failed to promptly recall its valsartan-containing medications for over a month after the initial recall was announced.  Defendant Torrent and Torrent Pharmaceuticals Limited failed to do so despite knowing that their medications contained valsartan sourced from Zhejiang Huahai Pharmaceuticals.

7.      Torrent's troubles did not end there.  On September 14, 2018, CNN reported that the FDA has found yet another cancer-causing impurity in three of the recalled lots of Torrent's valsartan-containing medications.  CNN was reporting on a September 13, 2018 press release from the FDA, which indicated that "[t]his second impurity, N-Nitrosodiethylamine (NDEA) is a known animal and suspected human carcinogen.  These Torrent products were included in the company's recall on August 23, 2018."  Thus, in the span of two weeks, two cancer-causing impurities were found in certain lots of Torrent's valsartan-containing products.

8.      Like NDMA, NDEA is acutely toxic when consumed orally.

9.      Generic drugs reach the market when the brand-name version of the drug comes off patent, and other competitors are able to seek approval for, market, and sell bioequivalent versions of the brand-name drug.  These generic equivalents are supposed to be of equal quality and equal safety.  According to the FDA, "[a]ll generic drugs approved by [the] FDA have the same high quality, strength, purity, and stability as brand-name drugs."

10.      To the contrary, Torrent's valsartan-containing medications are neither safe nor of equal quality to the brand-name version of the medication.  In fact, the European Medicines Agency explained that "NDMA is an unexpected impurity that was not detected by routine tests" by the API supplier, Zhejiang Huahai Pharmaceuticals, and that the change in the manufacturing process which led to the impurity was introduced in 2012 and is "believed to have produced

4

NDMA as a side product."  As such, this contamination has likely existed for approximately six years without being detected.

11.    Additionally, "[t]he FDA and the European Medicines Agency have learned that Zhejiang Huahai Pharmaceuticals (ZHP) found NDEA in several batches of its valsartan API. The FDA immediately began retesting all valsartan API and products, including both recalled products and those currently marketed in the United States, for NDEA.  Based on FDA testing to date, the agency discovered NDEA in some of ZHP's valsartan API.  This impurity was also found in Torrent's valsartan 160mg (lot BV47D001) and 320mg (lots BV48D001 and BV48D002) tablets, which were made using API from ZHP and were part of the earlier recall." Due to the nascent stages of the FDA's investigation as to the NDEA impurity, it is highly probable that additional batches were contaminated.

**B. Camber detects the presence of NDMA in its valsartan-containing medications sourced from Defendant Hetero, prompting an immediate recall.**

12.    As for Defendant Camber, on August 8, 2018, it announced a voluntary recall of all unexpired lots of its valsartan medication to the consumer level.  "This recall of multiple batches of Valsartan Tablets was prompted due to the detection of trace amounts of N-Nitrosodimethylamine (NDMA), a possible process impurity or contaminant in an active pharmaceutical ingredient, manufactured by Hetero Labs Limited, Unit – I (API manufacturer)." Hetero Labs Limited is a pharmaceutical company based in India – with Defendant Hetero as its U.S. subsidiary – whose valsartan products are labeled as "Camber Pharmaceuticals, Inc."  In fact, Camber's website includes Hetero's logos and intellectual property, demonstrating that Camber acts as Hetero's agent and alter ego in the United States.

13.    Camber boasts on its website its commitment to quality, and states that Camber "provide[s] the highest quality generics for our patients and our customers."  The website further

states that "[b]oth our American and Indian based manufacturing facilities utilize a quality and compliance process that meets extensive governmental regulations by the US Food and Drug Administration."  Camber warrants on its website that its generic drugs are "copies of brand-name drugs and are the same as those brand name drugs in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use."  As indicated above, however, these representations are false as its valsartan medications were contaminated with carcinogenic and liver toxic NDMA.

14.    This is not the first time that Camber and Hetero's manufacturing processes have been called into question by the FDA.  For example, a previous investigation in 2016 by the FDA revealed "significant violations" of current good manufacturing processes for finished pharmaceuticals.  This resulted in a warning letter from the FDA in August of 2017.  This latest incident is another unfortunate data point of a pattern of practice of deficient manufacturing practices by Camber and Hetero.

**C. Plaintiffs Stimma, Strand, and Lee were each harmed by purchasing and consuming contaminated valsartan-containing medications manufactured, distributed, and sold by Defendants.**

15.    Plaintiffs and the Class were injured by the full purchase price of their valsartan-containing medications.  These medications are worthless, as they are contaminated with carcinogenic and harmful NDMA (and now possibly NDEA as found in valsartan-containing medications manufactured by Torrent) and are not fit for human consumption.  Indeed, Plaintiffs have been instructed to immediately stop using the medication, and have turned in their remaining medication for another, non-contaminated brand.  Plaintiffs are further entitled to statutory damages, damages for the injury sustained in consuming high levels of acutely-toxic NDMA (and potentially NDEA), and for damages related to Defendants' conduct.

16.     Plaintiffs bring this action on behalf of the Class for equitable relief and to
recover damages and restitution for: (i) breach of express warranty; (ii) breach of the implied
warranty of merchantability; (iii) violation of the Connecticut Unfair Trade Practices Act; (iv)
violation of the Texas Deceptive Trade Practices-Consumer Protection Act; (v) violation of the
Washington Consumer Protection Act; (vi) unjust enrichment; (vii) fraudulent concealment;
(viii) fraud; (ix) conversion; (x) strict products liability; (xi) gross negligence; (xii) negligence;
and (xiii) battery.

## PARTIES

17.     Plaintiff Dominic Stimma is a citizen of Connecticut who resides in Branford,
Connecticut.  During all relevant time periods, Plaintiff Dominic Stimma was prescribed,
purchased, and consumed valsartan-containing medication manufactured and distributed by
Defendants Camber and Hetero, and sold by Defendant CVS.  At all times relevant hereto,
Defendant Camber was acting as the agent and alter ego of Hetero.  Plaintiff Stimma originally
learned about the valsartan recall by receiving a letter dated August 13, 2018 from Defendant
CVS, which informed him that Camber and Hetero were recalling his medication "because an
unexpected impurity was found in these products that may cause health risks."  Mr. Stimma later
discovered that not only was he sold contaminated medication from Camber, Hetero, and CVS,
but that CVS filled at least one of his prescriptions **after** the recall was announced.  Further
investigation revealed that Plaintiff Stimma has been using the contaminated valsartan
distributed by Camber and Hetero for some time.  When purchasing his valsartan-containing
medications from Defendants Camber, Hetero, and CVS, Plaintiff Stimma reviewed the
accompanying labels and disclosures, and understood them as representations and warranties by
the manufacturer, distributor, and pharmacy that the medications were properly manufactured

and free from contaminants and defects.  Plaintiff Stimma relied on these representations and warranties in deciding to purchase his valsartan-containing medications from Defendants Camber, Hetero, and CVS, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased his valsartan-containing medications from Defendants Camber, Hetero, and CVS if he had known that they were not, in fact, properly manufactured and free from contaminants and defects.  Plaintiff Stimma also understood that in making the sale, CVS was acting with the knowledge and approval of Camber and Hetero and/or as the agent of Camber and Hetero.  Plaintiff Stimma also understood that each purchase involved a direct transaction between himself and Camber and Hetero, because his medication came with packaging and other materials prepared by Camber and Hetero, including representations and warranties that his medications were properly manufactured and free from contaminants and defects.

18.    Plaintiff Margoth Strand is a citizen of Washington who resides in Seattle, Washington.  During all relevant time periods, Plaintiff Strand was prescribed valsartan-containing medication, which she purchased from Defendants QFC and Kroger in Seattle, Washington. At all times relevant hereto, QFC was acting as the agent and alter ego of Defendant Kroger.  Plaintiff Strand received a phone call from QFC advising her that the valsartan-containing medication she was taking, manufactured by Camber and Hetero, was contaminated and affected by the recall.  When purchasing her valsartan-containing medications from Defendants Camber, Hetero, QFC, and Kroger, Plaintiff Strand reviewed the accompanying labels and disclosures, and understood them as representations and warranties by both the manufacturer and pharmacy that the medications were properly manufactured and free from contaminants and defects.  Plaintiff Strand relied on these representations and warranties in

deciding to purchase her valsartan-containing medications from Defendants Camber, Hetero, QFC, and Kroger, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased her valsartan-containing medications from the aforementioned Defendants if she had known that they were not, in fact, properly manufactured and free from contaminants and defects. Plaintiff Strand also understood that in making the sale, QFC and Kroger were acting with the knowledge and approval of Camber and Hetero and/or as the agent of Camber and Hetero. Plaintiff Strand also understood that each purchase involved a direct transaction between herself and Camber and Hetero, because her medication came with packaging and other materials prepared by Camber and Hetero, including representations and warranties that her medications were properly manufactured and free from contaminants and defects.

19. Plaintiff Jynona Gail Lee is a citizen of Texas who resides in San Antonio, Texas. During all relevant time periods, Plaintiff Jynona Gail Lee was prescribed valsartan-containing medication manufactured by Torrent, which she purchased from Defendant Walmart in San Antonio, Texas. Plaintiff Lee received a letter from Walmart advising her that the valsartan-containing medication she was taking was affected by the recall. When purchasing her valsartan-containing medications from Torrent and Walmart, Plaintiff Lee reviewed the accompanying labels and disclosures, and understood them as representations and warranties by both the manufacturer and pharmacy that the medications were properly manufactured and free from contaminants and defects. Plaintiff Lee relied on these representations and warranties in deciding to purchase her valsartan-containing medications from Torrent and Walmart, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased her valsartan-containing medications from Torrent and Walmart if she had known that

they were not, in fact, properly manufactured and free from contaminants and defects. Plaintiff
Lee also understood that in making the sale, Walmart was acting with the knowledge and
approval of Torrent and/or as the agent of Torrent. Plaintiff Lee also understood that each
purchase involved a direct transaction between herself and Torrent, because her medication came
with packaging and other materials prepared by Torrent, including representations and warranties
that her medications were properly manufactured and free from contaminants and defects.

20.    Defendant Torrent Pharma, Inc. is a corporation organized under the laws of the
State of Delaware and maintains its principal place of business at 150 Allen Road, Basking
Ridge, New Jersey 07920. Defendant Torrent conducts substantial business in New Jersey and
Texas. Torrent has been engaged in the manufacturing, sale, and distribution of adulterated
generic valsartan in the United States, including in New Jersey and Texas.

21.    Defendant Camber Pharmaceuticals, Inc. is a corporation organized under the
laws of the State of Delaware and maintains its principal place of business at 1031 Centennial
Avenue, Piscataway, New Jersey 08854. Defendant Camber conducts substantial business in
New Jersey, Washington, and Connecticut. Defendant Camber has been engaged in the
manufacturing, sale, and distribution of adulterated generic valsartan in the United States,
including the states of New Jersey, Washington, and Connecticut. Defendant Camber explains
on its website that its parent company is Hetero Drugs Limited, based in India.

22.    Defendant Hetero USA, Inc. is a corporation organized under the laws of the
State of Delaware and maintains its principal place of business at 1035 Centennial Avenue,
Piscataway, New Jersey 08854. Hetero is the U.S. branch office of Hetero Drugs Limited.
Defendant Hetero acts as the agent and alter ego of Hetero Drugs Limited in the United
States. Hetero designs, manufactures, markets, distributes and sells valsartan-containing

medication in the United States, and in the states of Connecticut and Washington.

23. Defendant The Kroger Co. is a corporation organized under the laws of the State of Delaware and maintains its principal place of business at 1014 Vine Street, Cincinnati, Ohio. On Kroger's website, QFC is listed as one of "The Kroger Family of Companies." Kroger, through its alter ego and agent QFC, conducts substantial business in New Jersey and Washington. Kroger, through its various entities, including QFC, sells valsartan-containing medication in the United States, and in New Jersey, Connecticut, and Washington. There exists, and at all times herein existed, a unity of ownership between Kroger and QFC, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the other. Upon information and belief, Kroger communicates with QFC concerning virtually all aspects of its business in the United States. At all relevant times, QFC acted as an authorized agent, representative, servant, employee and/or alter ego of Kroger while performing activities including but not limited to selling valsartan-containing medications in the United States and in New Jersey, Connecticut, and Washington.

24. Defendant Quality Food Centers, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at 10116 NE 8th Street, Bellevue, Washington 98004. Among other services, QFC provides pharmacy services. Defendant QFC conducts substantial business in New Jersey and Washington.

25. Defendant CVS Health Co. f/k/a CVS Caremark is a corporation organized under the laws of the State of Rhode Island and Providence Plantations and maintains its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Among other services, CVS provides pharmacy services. Defendant CVS conducts substantial business in New Jersey and Connecticut.

11

26.     Defendant Wal-Mart Stores, Inc. is a corporation incorporated under the laws of the State of Delaware, and maintains its principal place of business at 702 Sw 8th Street, Bentonville, Arkansas 72716.  Among other services, Walmart provides pharmacy services. Defendant Walmart conducts substantial business in New Jersey and Texas.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below (the "Class"), is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District, Defendants Torrent and Camber have their principal places of business in this District, and because Defendants (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of contaminated valsartan-containing medications in this District; (b) conduct substantial business in this District; and (c) are subject to personal jurisdiction in this District.

29.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased or paid for valsartan-containing medications that are contaminated with NDMA (the "Class").  Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities

related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

30.    Plaintiff Strand also seeks to represent a subclass of all Class members who purchased valsartan-containing medications in Washington (the "Washington Subclass").

31.    Plaintiff Stimma also seeks to represent a subclass of all Class members who purchased valsartan-containing medications in Connecticut (the "Connecticut Subclass").

32.    Plaintiff Lee also seeks to represent a subclass of all Class members who purchased valsartan-containing medications in Texas (the "Texas Subclass").

33.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

34.    **Numerosity.**  The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of members in the Class.  Although the precise number of Class members is unknown to Plaintiffs, the true number of Class members is known by Defendants.  More specifically, Defendants maintain databases that contain the following information: (i) the name of each Class member who was prescribed the contaminated medication; (ii) the address of each Class member; and (iii) each Class member's payment information related to the contaminated medication.  Thus, Class members may be identified and notified of the pendency of this action by U.S. Mail, electronic mail, and/or published notice, as is customarily done in consumer class actions.

35.    **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and predominate over any

questions affecting only individual Class members.  These common legal and factual questions

include, but are not limited to, the following:

(a)      whether the valsartan-containing medications manufactured, distributed, and sold

by Defendants were in fact contaminated with NDMA and/or NDEA, thereby breaching the

express and implied warranties made by Defendants and making the medication unfit for human

consumption and therefore unfit for their intended purpose, and constituting a clear

manufacturing defect for purposes of strict liability and negligence, as well as battery as to the

victims of the contaminated medication;

(b)      whether Defendants knew or should have known that the valsartan-containing

medications were in fact contaminated with NDMA prior to the recall, thereby constituting fraud

and/or fraudulent concealment, and negligence or gross negligence;

(c)      whether Defendants have unlawfully converted money from Plaintiffs and the

Class;

(d)      whether Defendants are liable to Plaintiffs and the Class for unjust enrichment;

(e)      whether Defendants are liable to Plaintiffs and the Class for fraudulent

concealment;

(f)      whether Defendants are liable to Plaintiff and the Class for violations of the

Connecticut, Texas, and Washington consumer-protection laws;

(g)      whether Defendants are liable to Plaintiffs for breaches of express and implied

warranties;

(h)      whether Plaintiffs and the Class have sustained monetary loss and the proper

measure of that loss;

(i)      whether Plaintiffs and the Class are entitled to declaratory and injunctive relief;

(j)      whether Plaintiffs and the Class are entitled to restitution and disgorgement from Defendants; and

(k)      whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

36.      **Typicality.**  Plaintiffs' claims are typical of the claims of the other members of the Class in that Defendants mass marketed and sold contaminated medications to consumers throughout the United States.  This contamination was present in all of the recalled medications manufactured, distributed, and sold by Defendants.  Therefore, Defendants breached their express and implied warranties to Plaintiffs and Class members by manufacturing, distributing, and selling the contaminated valsartan medication.  Plaintiffs' claims are typical in that they were uniformly harmed in purchasing and consuming the contaminated medications.  Plaintiffs' claims are further typical in that Defendants deceived Plaintiffs in the very same manner as they deceived each member of the Class.  Further, there are no defenses available to Defendants that are unique to Plaintiffs.

37.      **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class.

38.      **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible

15

for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

39.    In the alternative, the Class may also be certified because:

(a)    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

### COUNT I
### Breach Of Express Warranty
### (On Behalf Of The Nationwide Class)

40.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

41.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and the Subclasses against Defendants.

42.     Plaintiffs, and each member of the nationwide Class, formed a contract with Defendants at the time Plaintiffs and the other Class members purchased the contaminated valsartan medications.  The terms of the contract include the promises and affirmations of fact made by Defendants on the contaminated medication's packaging and through marketing and advertising, including that the product would be of the same quality and equally as safe as the brand-name version of the medication.  This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Class and Defendants.

43.     Defendants further expressly warranted that the valsartan-containing medications would contain only what was stated on the label, and would not contain harmful and carcinogenic defects and impurities such as NDMA and NDEA.  Plaintiffs relied on the express warranty that their medication would contain only what was stated on the label, and that it would not be contaminated with impurities.  These express warranties further formed the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Class and Defendants.

44.     Defendants purport, through their advertising, labeling, marketing and packaging to create an express warranty that the medication would be of the same quality and of equal safety as the name-brand medication.

45.     Plaintiffs and the Class performed all conditions precedent to Defendants' liability under this contract when they purchased the contaminated medication.

46.     Defendants breached express warranties about the contaminated medication and

their qualities because Defendants' statements about the contaminated medications were false

and the contaminated medication does not conform to Defendants' affirmations and promises

described above.

47.    Plaintiffs and each of the members of the Class would not have purchased the

contaminated medication had they known the true nature of the contaminated medication's

ingredients and what the contaminated medication contained (*i.e.*, NDMA and/or NDEA).

48.    As a result of Defendants' breaches of express warranty, Plaintiffs and each of the

members of the Class have been damaged in the amount of the purchase price of the Product and

any consequential damages resulting from the purchases.

49.    On September 26, 2018, prior to filing this action, Defendants were served with a

pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  Plaintiffs'

counsel sent Defendants a letter advising them that they breached an express warranty and

demanded that they cease and desist from such breaches and make full restitution by refunding

the monies received therefrom.  A true and correct copy of Plaintiffs' counsel's letter is attached

hereto as **Exhibit A**.

**COUNT II**
**Breach Of The Implied Warranty Of Merchantability**
**(On Behalf Of The Nationwide Class)**

50.    Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs of this complaint.

51.    Plaintiffs bring this claim individually and on behalf of the members of the

proposed Class and the Subclasses against Defendants.

52.    Defendants, as the designers, manufacturers, marketers, distributors, and/or

sellers, impliedly warranted that the valsartan-containing medications (i) contained no NDMA

18

and/or NDEA and (ii) are generally recognized as safe for human consumption.

53.    Defendants breached the warranty implied in the contract for the sale of the contaminated valsartan-containing medications because they could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because the valsartan-containing medications manufactured, distributed, and sold by Defendants were contaminated with carcinogenic and liver toxic NDMA and/or NDEA, and as such are not generally recognized as safe for human consumption.  As a result, Plaintiffs and Class members did not receive the goods as impliedly warranted by Defendants to be merchantable.

54.    Plaintiffs and Class members purchased the valsartan-containing medications in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

55.    The valsartan-containing medications were not altered by Plaintiffs or Class members.

56.    The valsartan-containing medications were defective when they left the exclusive control of Defendants.

57.    Defendants knew that the valsartan-containing medications would be purchased and used without additional testing by Plaintiffs and Class members.

58.    The contaminated valsartan medication was defectively manufactured and unfit for its intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

59.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have

purchased the valsartan-containing medication on the same terms if they knew that the products

contained NDMA, and are not generally recognized as safe for human consumption; and (b) the

valsartan-containing medications do not have the characteristics, ingredients, uses, or benefits as

promised by Defendants.

<u>COUNT III</u>
**Violation of the Connecticut Unfair Trade Practices Act**
**(On Behalf Of The Connecticut Subclass)**

60.     Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs of this complaint.

61.     Plaintiff Stimma brings this claim individually and on behalf of the members of

the proposed Connecticut Subclass against Camber, Hetero, and CVS.

62.     Plaintiff Stimma and the Connecticut Subclass are consumers who were

prescribed and purchased valsartan-containing medication from Defendants Camber, Hetero, and

CVS for their personal use.

63.     Connecticut's Unfair Trade Practices Act states:  "No person shall engage in

unfair methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  Further, "[i]t is the intention of the

legislature that this chapter be remedial and be so construed."  Conn. Gen. Stat. § 42-110b(d).

64.     In its sale of goods throughout the State of Connecticut, Defendants Camber,

Hetero, and CVS conduct "trade" and "commerce" within the meaning and intendment of Conn.

Gen. Stat. § 42-110a(4).

65.     Defendants Camber, Hetero, and CVS are "Persons" as defined by Conn. Gen.

Stat. § 42-110a(3).

66.     By the acts and conduct alleged herein, Defendants Camber, Hetero, and CVS

have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the valsartan-containing medications (i) contained no NDMA or other harmful impurities; and (ii) are generally recognized as safe for human consumption.

67.    The foregoing deceptive acts and practices were directed at consumers.

68.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the valsartan-containing medications manufactured, distributed, and sold by Defendants Camber, Hetero, and CVS to induce consumers to purchase the same.

69.    By reason of this conduct, Defendants Camber, Hetero, and CVS engaged in deceptive conduct in violation of Connecticut's Unfair Trade Practices Act.

70.    Defendants Camber, Hetero, and CVS's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiffs and members of the Connecticut Subclass have sustained from having paid for and consumed Defendants Camber, Hetero, and CVS's products.

71.    As a result of Defendants' violations, Plaintiffs and members of the Subclass have suffered damages because: (a) they would not have purchased Defendants Camber, Hetero, and CVS's valsartan-containing medications on the same terms if they knew that the products contained NDMA, and are not generally recognized as safe for human consumption; and (b) Defendants Camber, Hetero, and CVS's valsartan products do not have the characteristics, ingredients, uses, or benefits promised.

72.    On behalf of himself and other members of the Connecticut Subclass, Plaintiff Stimma seeks to recover his economic damages, punitive damages, attorneys' fees and costs, injunctive relief enjoining Defendant Camber, Hetero, and CVS from continuing their deceptive trade practices, and any other relief the Court deems just and proper.

73.     Plaintiffs will provide notice of this action and a copy of this Complaint to the appropriate Attorneys General pursuant to Conn. Gen. Stat. § 42-110g(c).

## COUNT IV
### Violation Of The Texas Deceptive Trade Practices-Consumer Protection Act
### (On Behalf Of The Texas Subclass)

74.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

75.     Plaintiff Lee brings this claim individually and on behalf of the members of the proposed Texas Subclass against Torrent and Walmart.

76.     The Texas Deceptive Trade Practices-Consumer Protection Act forbids "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."  Tex. Bus. & Com. Code § 17.46(a).  The statute is to "be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection."  Tex. Bus. & Com. Code § 17.44.

77.     Plaintiff Lee and the Texas Subclass members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

78.     Torrent and Walmart advertised, offered, and sold contaminated valsartan-containing medication in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

79.     Torrent and Walmart engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

(a)     Representing that the valsartan-containing medications manufactured and sold by Torrent and Walmart have sponsorship, approval, characteristics, ingredients, uses, benefits or

22

quantities they do not have (i.e. they represented that their valsartan-containing medications were not contaminated with harmful impurities, including NDMA and NDEA, when in fact the medications were contaminated with said impurities);

(b)    Representing that the valsartan-containing medications manufactured and sold by Torrent and Walmart are of a particular standard, quality or grade, when in fact they are contaminated with harmful impurities, NDMA and NDEA, rendering them unfit for human use;

(c)    Advertising the valsartan-containing medications with the intent not to sell them as advertised; and

(d)    By selling Plaintiff Lee and Texas Subclass members adulterated valsartan-containing medication containing carcinogenic and toxic NDMA and NDEA without disclosing the true nature of the medications, Torrent and Walmart unlawfully failed to disclose information concerning goods or services which were known at the time of the transaction, and such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

80.    Torrent and Walmart's false, misleading, and deceptive acts and practices include:

(a)    Failing to conduct sufficient quality-control procedures to ensure that the valsartan-containing medications they manufactured, distributed, and sold were of merchantable quality and safe for their intended use, and, at minimum, not contaminated with acutely-toxic, carcinogenic impurities such as NDMA and NDEA.

(b)    Failing to disclose and overtly concealing known harmful defects in the valsartan-containing medication manufactured, distributed, and sold by Torrent and Walmart, as there is evidence that this contamination has likely existed for approximately six years before finally being disclosed to consumers.

81.     Torrent and Walmart's false, misleading, and deceptive statements and representations of fact, including but not limited to, that the medication was safe and was not tainted with harmful impurities such as NDMA and/or NDEA ("the Misrepresentations"), were and are directed to consumers.  Torrent and Walmart intended to mislead Plaintiff Lee and the members of the Texas Subclass to induce them to rely on its misrepresentations and omissions. Plaintiff Lee and members of the Texas Subclass relied on Torrent and Walmart's representations, to their detriment.

82.     As set forth at length above, Torrent and Walmart breached express and implied warranties to Plaintiff Lee and the Texas Subclass by warranting that the valsartan-containing medication manufactured and sold by said Defendants was of merchantable quality, fit for human use, and not contaminated with harmful and toxic impurities such as NDMA and NDEA, when in fact the medications were contaminated and unfit for human use.

83.     Defendants' false, misleading, and deceptive statements and representations of fact, including but not limited to the Misrepresentations, were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

84.     Torrent and Walmart engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code § 17.50(a)(3).  Torrent and Walmart engaged in acts and practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.  Consumers, including Plaintiff Lee and the Texas Subclass members, lacked knowledge about the impurities and contaminants in the valsartan-containing medications sold to them by Torrent and Walmart.  Torrent and Walmart took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result.

85.     As such, Torrent and Walmart acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff Lee's and the Texas Subclass members' rights.

86.     Torrent and Walmart's false, misleading, and deceptive statements and representations of fact, including but not limited to the Misrepresentations, have resulted in consumer injury or harm to the public interest.

87.     Plaintiffs and members of the Texas Subclass have been injured because: (a) they would not have purchased the contaminated valsartan-containing medication if they had known that the medications contained liver-toxic and carcinogenic NDMA and NDEA; and (b) the medications do not have the characteristics, uses, or benefits as promised, namely that the medications were contaminated with NDMA and NDEA.  As a result, Plaintiffs and members of the Texas Subclass have been damaged in the full amount of the purchase price of the medications.

88.     As a result of Torrent and Walmart's false, misleading, and deceptive statements and representations of fact, including but not limited to the Misrepresentations, Plaintiffs have suffered and will continue to suffer economic injury.

89.     On behalf of herself and other members of the Texas Subclass, Plaintiff Lee seeks to enjoin the unlawful acts and practices described herein, to recover all economic damages, damages for mental anguish, treble damages for both the economic damages and mental anguish awards, court costs, attorneys' fees, and any other relief the Court deems just and proper.

90.     Plaintiffs have complied with the notice requirements set forth in Tex. Bus. & Com. Code § 17.501, and will forward a copy of this Complaint in accordance with the time frames set forth in Tex. Bus. & Com. Code § 17.501.

91.    On September 26, 2018, prior to filing this action, Defendants were served with a pre-suit notice letter that complied in all respects with Tex. Bus. & Com. Code § 17.505.  *See* **Exhibit A**.

### COUNT V
**Violation Of The Washington Consumer Protection Act**
**(On Behalf Of The Washington Subclass)**

92.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

93.    Plaintiff Strand brings this claim on behalf of herself and the Washington Subclass against Defendants Camber, Hetero, Kroger, and QFC.

94.    Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce …."  Wash. Rev. Code § 19.86.020.

95.    The actions by Defendants Camber, Hetero, Kroger, and QFC, as set forth at length above, occurred in the conduct of trade or commerce.

96.    By the acts and conduct alleged herein, Defendants Camber, Hetero, Kroger, and QFC have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the valsartan-containing medications (i) contained no NDMA or other harmful impurities; and (ii) are generally recognized as safe for human consumption.

97.    The foregoing deceptive acts and practices were directed at consumers.

98.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the valsartan-containing medications manufactured, distributed, and sold by Defendants Camber, Hetero,

Kroger, and QFC to induce consumers to purchase the same.

99.     By reason of this conduct, Defendants Camber, Hetero, Kroger, and QFC engaged in deceptive conduct in violation of the Washington Consumer Protection Act which have caused injury to Plaintiff Strand and members of the Washington Subclass, and had and will continue to have the capacity to injure other persons if Defendants Camber, Hetero, Kroger, and QFC are not stopped from manufacturing, distributing, and selling contaminated valsartan-containing medications.

100.    Defendants Camber, Hetero, Kroger, and QFC's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff Strand and members of the Washington Subclass have sustained from having paid for and consumed Defendants' products.

101.    As a result of Defendants Camber, Hetero, Kroger, and QFC's violations, Plaintiff Strand and members of the Washington Subclass have suffered damages because: (a) they would not have purchased Defendants Camber, Hetero, Kroger, and QFC's valsartan-containing medications on the same terms if they knew that the products contained NDMA, and are not generally recognized as safe for human consumption; and (b) Defendants Camber, Hetero, Kroger, and QFC's valsartan products do not have the characteristics, ingredients, uses, or benefits promised.

102.    On behalf of herself and other members of the Washington Subclass, Plaintiff Strand seeks to enjoin the unlawful acts and practices described herein, to recover all economic damages, treble damages, court costs, attorneys' fees, and any other relief the Court deems just and proper.

103.    Plaintiffs will provide notice of this action and a copy of this Complaint to the appropriate Attorneys General pursuant to Wash. Rev. Code § 19.86.095.

## COUNT VI
### Unjust Enrichment
### (On Behalf Of The Nationwide Class)

104.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

105.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

106.    Plaintiffs and the Class conferred a benefit on Defendants in the form of monies paid to purchase Defendants' contaminated valsartan medication.

107.    Defendants voluntarily accepted and retained this benefit.

108.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for contaminated medications unfit for human use, it would be unjust and inequitable for the Defendants to retain it without paying the value thereof.

## COUNT VII
### Fraudulent Concealment
### (On Behalf Of The Nationwide Class)

109.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

110.    Defendants had a duty to disclose material facts to Plaintiffs and the Class given their relationship as contracting parties and intended users of the medication.  Defendants also had a duty to disclose material facts to Plaintiffs and the Class, namely that they were in fact manufacturing, distributing, and selling harmful and contaminated medications unfit for human consumption, because Defendants had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

28

111.   Defendants possessed knowledge of these material facts.  In fact, reports from government agencies reveal that this contamination may date back to 2012.  Defendants therefore withheld the knowledge of the contamination for nearly six years before finally disclosing the issue in July 2018.  During that time, Plaintiffs and Class members were using the medication without knowing it contained the harmful impurity NDMA and/or NDEA.

112.   Defendants failed to discharge their duty to disclose these materials facts.

113.   In so failing to disclose these material facts to Plaintiffs and the Class, Defendants intended to hide from Plaintiffs and the Class that they were purchasing and consuming medications with harmful impurities that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

114.   Plaintiffs and the Class reasonably relied on Defendants' failure to disclose insofar as they would not have purchased the contaminated valsartan medication manufactured, distributed, and sold by Defendants had they known it was contaminated with NDMA.

115.   As a direct and proximate cause of Defendants' fraudulent concealment, Plaintiffs and the Class suffered damages in the amount of monies paid for the defective medication.

116.   As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

## COUNT VIII
### Fraud
### (On Behalf Of The Nationwide Class)

117.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

118.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

119.    As discussed above, Defendants provided Plaintiffs and Class members with false or misleading material information about the valsartan medications manufactured, distributed, and sold by Defendants.  For example, Defendant Camber boasts on its website its commitment to quality, and states that Camber "provide[s] the highest quality generics for our patients and our customers."  The website further states that "[b]oth our American and Indian based manufacturing facilities utilize a quality and compliance process that meets extensive governmental regulations by the US Food and Drug Administration."  Camber warrants on its website that its generic drugs are "copies of brand-name drugs and are the same as those brand name drugs in dosage form, **safety**, strength, route of administration, **quality**, performance characteristics and intended use."  As indicated above, however, these representations are false as its valsartan medications were contaminated with carcinogenic and liver toxic NDMA.

120.    Similarly, Torrent similarly claims to have "world-class manufacturing facilities" that provide "quality medicines at [an] affordable price."  As indicated above, however, these representations are false as its valsartan medications were contaminated with carcinogenic and liver toxic NDMA and/or NDEA.

121.    The misrepresentations and omissions of material fact made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase these contaminated valsartan-containing medications.

122.    Defendants knew that the medications contained these harmful impurities, but continued to manufacture them for nearly six years until finally reporting the issue.  In fact, reports from government agencies reveal that this contamination can date back to 2012. Defendants therefore withheld the knowledge of the contamination for nearly six years before

finally disclosing the issue.  During that time, Plaintiffs and Class Members were using the medication without knowing it contained the harmful impurity NDMA and/or NDEA.

123.    The misrepresentations and omissions of material fact made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase these contaminated valsartan-containing medications.

124.    Defendants knew that the medications contained these harmful impurities, but continued to manufacture them for nearly six years until finally reporting the issue.  In fact, reports from government agencies reveal that this contamination can date back to 2012. Defendants therefore withheld the knowledge of the contamination for nearly six years before finally disclosing the issue.  During that time, Plaintiffs and Class Members were using the medication without knowing it contained the harmful impurity NDMA and/or NDEA.

125.    The fraudulent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

126.    As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

### COUNT IX
### Conversion
### (On Behalf Of The Nationwide Class)

127.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

128.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

129.    Plaintiffs and the Class have an ownership right to the monies paid for the

contaminated medication manufactured, distributed, and sold by Defendants.

130.    Defendants have wrongly asserted dominion over the payments illegally diverted to them for the contaminated medication.  Defendants have done so every time that Plaintiffs and the Class have paid to have their prescriptions filled.

131.    As a direct and proximate cause of Defendants' conversion, Plaintiffs and the Class suffered damages in the amount of the payments made for each time they filled their prescriptions.

**COUNT X**
**Strict Liability – Manufacturing Defect**
**(On Behalf Of The Nationwide Class)**

132.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

133.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

134.    The NDMA and/or NDEA impurity contained in the Defendants' medications was a mishap in the manufacturing process which led to the valsartan medications containing the harmful impurity NDMA and/or NDEA.  Neither NDMA nor NDEA were intended to be included in the medication; it was an impurity that was created due to an error in the manufacturing process.

135.    Due to the NDMA impurity, the product was not reasonably safe as marketed because NDMA is a known carcinogen and is damaging to the liver, and, according to the FDA, the level of NDMA in the effected medication far exceeded acceptable levels, warranting an immediate recall of the effected medication.  The impurity NDEA found in certain lots of the Torrent medications is also an acutely-harmful carcinogen.

136.    Plaintiffs and all Class members used the product for its intended purpose, meaning they used the product as prescribed by their respective doctors.

137.    There is no way that Plaintiffs or Class members could have discovered the defect by exercising reasonable care.  There was no way for Plaintiffs or Class Members to tell by visually observing, tasting, or smelling the medication that it was in fact contaminated with NDMA and/or NDEA.  Nothing short of laboratory tests (which should have been done by Defendants for quality control purposes) would have revealed the defect to the unsuspecting consumer.

138.    Because Plaintiffs and Class members had no way of knowing that their medication was in fact contaminated, Plaintiffs and Class members could not have avoided the injury by exercising ordinary care.

139.    Defendants were supposed to manufacture, distribute, and sell valsartan-containing medications without any harmful impurities such as NDMA and NDEA.  The valsartan medications were not designed or intended to contain NDMA or NDEA.  These impurities resulted from a manufacturing defect which allowed the medication to become contaminated.

140.    Plaintiffs and class members suffered harm as a result of consuming this contaminated medication.  The ingestion of NDMA is acutely harmful.  NDMA, when ingested orally, is immediately harmful to the liver, kidneys, and pulmonary function.  Animal studies confirm that acute exposure of NDMA "demonstrated that [NDMA] has high to extreme acute toxicity from inhalation or **oral exposure**."  "Acute toxicity refers to those adverse effects occurring following oral or dermal administration of a single dose of a substance, or multiple doses given within 24 hours, or an inhalation exposure of 4 hours."  As such, NDMA causes

33

harm as soon as it is consumed.  The same is true for NDEA.

141.    Importantly, Plaintiffs and the Class members do not seek resolution of downstream effects of NDMA such as cancer, jaundice, and other individualized illnesses on a class-wide basis.  Any such actions can and should be redressed on an individual basis as they arise.  However, because of the acute toxicity of NDMA, Plaintiffs and class-members suffered a concrete and identical harm that can and should be addressed on a class-wide basis.

142.    Because the valsartan medications manufactured, distributed, and sold by Defendants suffered from a manufacturing defect which caused Plaintiffs and Class members an immediate and concrete harm, Defendants are strictly liable to Plaintiffs.

## COUNT XI
### Gross Negligence
### (On Behalf Of The Nationwide Class)

143.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

144.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

145.    Defendants owed a duty of care to Plaintiffs to manufacture, distribute, and sell the subject valsartan medications free from harmful defects and impurities.

146.    Defendants breached that duty by manufacturing, distributing, and selling valsartan medication contaminated with NDMA and/or NDEA.

147.    Plaintiffs and Class members were injured by ingesting an acutely toxic substance, to wit NDMA and/or NDEA, which was negligently present in the valsartan medications manufactured, distributed, and sold by Defendants.  Plaintiffs and Class members also suffered economic damages and emotional distress from the purchase and use of the

valsartan-containing medications.

148.    Importantly, Plaintiffs and the Class members do not seek resolution of downstream effects of NDMA such as cancer, jaundice, and other individualized illnesses on a class-wide basis.  Any such actions can and should be redressed on an individual basis as they arise.  However, because of the acute toxicity of NDMA, Plaintiffs and class-members suffered a concrete and identical harm that can and should be addressed on a class-wide basis.

149.    As this defective condition traces back to 2012, with nearly six years between when the defect arose and any action was taken, Defendants' conduct evinces a reckless disregard for the rights of others, and strongly suggests intentional wrongdoing.

150.    Because the valsartan medications manufactured, distributed, and sold by Defendants suffered from a harmful impurity constituting a breach of Defendants' duty to Plaintiffs and Class members, and because Defendants failed to act to remediate the harmful impurity for nearly six years, Defendants are grossly negligent and are liable to Plaintiffs for all injuries proximately caused by Defendants' gross negligence.

## COUNT XII
### Negligence
### (On Behalf Of The Nationwide Class)

151.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

152.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

153.    Defendants owed a duty of care to Plaintiffs to manufacture, distribute, and sell the subject valsartan medications free from harmful defects and impurities.

154.    Defendants breached that duty by manufacturing, distributing, and selling

35

valsartan medication contaminated with NDMA and/or NDEA.

155.    Plaintiffs and Class members were injured by ingesting an acutely toxic substance, to wit NDMA and/or NDEA, which was negligently present in the valsartan medications manufactured, distributed, and sold by Defendants.

156.    Importantly, Plaintiffs and the Class members do not seek resolution of downstream effects of NDMA such as cancer, jaundice, and other individualized illnesses on a class-wide basis.  Any such actions can and should be redressed on an individual basis as they arise.  However, because of the acute toxicity of NDMA, Plaintiffs and class-members suffered a concrete and identical harm that can and should be addressed on a class-wide basis.

157.    Because the valsartan medications manufactured, distributed, and sold by Defendants suffered from a harmful impurity constituting a breach of Defendants' duty to Plaintiffs and class members, Defendants are negligent and are liable to Plaintiffs for all injuries proximately caused by Defendants' negligence.

## COUNT XIII
### Battery
### (On Behalf Of The Nationwide Class)

158.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

159.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendants.

160.    Defendants manufactured, distributed, and sold the contaminated valsartan medication to Plaintiffs and Class members with the knowledge and intent that Plaintiffs and Class members would ingest the medication.  Defendants thus had knowledge that the harmful medication would come into contact with the bodies of Plaintiffs and Class members.

161.    The intended contact, i.e. the medication being ingested by Plaintiffs, was harmful in nature because the medication contained the harmful impurity NDMA and/or NDEA.

162.    As such, Defendants committed an unlawful battery on Plaintiffs and Class members, who ingested the medication.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.    For an order certifying the nationwide Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel to represent the Class and members of each of the Subclasses;

B.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiffs, the nationwide Class, and the Subclasses on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and

H.    For an order awarding Plaintiffs and the Class and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  September 26, 2018                  Respectfully submitted,

                                           **BURSOR & FISHER, P.A.**

                                           By:    */s/ Andrew J. Obergfell*
                                                      Andrew J. Obergfell

                                           Andrew J. Obergfell
                                           888 Seventh Avenue
                                           New York, NY  10019
                                           Telephone: (212) 837-7150
                                           Facsimile:  (212) 989-9163
                                           Email: aobergfell@bursor.com

**EXHIBIT A**

# BURSOR & FISHER
P.A.

888 SEVENTH AVENUE
3ᴿᴰ FLOOR
NEW YORK, NY 10019
www.bursor.com

ANDREW J. OBERGFELL
Tel: 646.837.7129
Fax: 212.989.9163
aobergfell@bursor.com

September 26, 2018

_**Via Certified Mail – Return Receipt Requested**_

Torrent Pharma, Inc.
150 Allen Road
Basking Ridge, New Jersey 07920

Camber Pharmaceuticals, Inc.
1031 Centennial Avenue
Piscataway, New Jersey 08854

Hetero USA, Inc.
1035 Centennial Avenue
Piscataway, New Jersey 08854

The Kroger Co.
1014 Vine Street
Cincinnati, Ohio 45202

Quality Food Centers, Inc.
10116 NE 8ᵗʰ Street
Bellevue, Washington 98004

CVS Health Co.
One CVS Drive
Woonsocket, Rhode Island 02895

Wal-Mart Stores, Inc.
702 Sw 8ᵗʰ Street
Bentonville, Arkansas 72716

Re:     _Notice and Demand Letter Pursuant to U.C.C. § 2-607, the Texas Deceptive Trade
        Practices-Consumer Protection Act, the Connecticut Unfair Trade Practices Act, and the
        Washington Consumer Protection Act_

To Whom It May Concern:

        This letter serves as a preliminary notice and demand for corrective action by Torrent
Pharma, Inc. ("Torrent"), Camber Pharmaceuticals, Inc. ("Camber"), Hetero USA, Inc.
("Hetero"), The Kroger Co. ("Kroger"), Quality Food Centers, Inc. ("QFC"), CVS Health Co.

BURSOR & FISHER
P.A.

("CVS"), and Wal-Mart Stores, Inc. ("Walmart") pursuant to U.C.C. § 2-607(3)(a) concerning breaches of express and implied warranties – and violations of state consumer protection laws – related to our clients, Dominic Stimma, Margoth Strand, and Jynona Gail Lee, and a class of all similarly situated purchasers (the "Class") of contaminated valsartan-containing medication manufactured and distributed by Torrent, Camber, and Hetero, and sold by Kroger, QFC, CVS, and Walmart.

Our clients were prescribed and purchased valsartan-containing medication manufactured and distributed by Torrent, Camber, and Hetero, and sold by Kroger, QFC, CVS, and Walmart. Our clients' respective valsartan-containing medications were contaminated with N-nitrosodimethylamine ("NDMA"), a carcinogenic and liver-damaging impurity. On July 13, 2018, the U.S. Food & Drug Administration announced a voluntary recall of several brands of valsartan-containing generic medications. The recall was due to the presence of NDMA in the recalled products. Following that initial recall, valsartan-containing medications manufactured and distributed by Torrent, Camber, and Hetero were also recalled due to the presence of NDMA in the recalled products. This defect rendered the products unusable and unfit for human consumption. In short, the valsartan-containing medications that our clients and the Class were purchasing are worthless as they contained a toxic impurity rendering them unfit for human use. Torrent, Camber, Hetero, Kroger, QFC, CVS, and Walmart each violated express and implied warranties made to our clients and the Class regarding the quality and safety of the valsartan-containing medications they purchased. *See* U.C.C. §§ 2-313, 2-314.

As for Torrent and Walmart, this letter also serves as notice of violation of the Texas Deceptive Trade Practices-Consumer Protection Act based on the facts alleged above. As a result of Torrent and Walmart's violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Ms. Lee sustained an injury. Ms. Lee hereby demands full recovery of all economic damages sustained by her purchase of the medication, damages for mental anguish associated with purchasing and consuming a carcinogenic medication, all costs and expenses, and reasonable attorneys' fees.

As for Camber, Hetero, and CVS, this letter serves as notice of violation of the Connecticut Unfair Trade Practices Act based on the facts alleged above. As a result of Camber, Hetero, and CVS's violation of the Connecticut Unfair Trade Practices Act, Mr. Stimma sustained an injury. Mr. Stimma hereby demands full recovery of all economic damages sustained by his purchase of the medication, punitive damages, and attorneys' fees and costs.

As for Camber, Hetero, Kroger, and QFC, this letter serves as notice of violation of the Washington Consumer Protection Act based on the facts alleged above. As a result of Camber, Hetero, Kroger, and QFC's violation of the Washington Consumer Protection Act, Ms. Strand sustained an injury. Ms. Strand hereby demands full recovery of all economic damages sustained by her purchase of the medication, treble damages, court costs, and attorneys' fees.

On behalf of our clients and the Class, we hereby demand that Torrent, Camber, Hetero, Kroger, QFC, CVS, and Walmart immediately (1) cease and desist from continuing to sell contaminated valsartan-containing medications and (2) make full restitution to all purchasers of the contaminated valsartan-containing medications of all purchase money obtained from sales thereof.

BURSOR&FISHER
P.A.

We also demand that Torrent, Camber, Hetero, Kroger, QFC, CVS, and Walmart preserve all documents and other evidence which refers or relates to any of the above-described practices including, but not limited to, the following:

1.     All documents concerning the packaging, labeling, and manufacturing process for Torrent, Camber, and Hetero's valsartan-containing medications;

2.     All documents concerning the design, development, supply, production, extraction, and/or testing of valsartan-containing medications manufactured and distributed by Torrent, Camber, and Hetero;

3.     All tests of the valsartan-containing medications manufactured and distributed by Torrent, Camber, and Hetero;

4.     All documents concerning the pricing, advertising, marketing, and/or sale of valsartan-containing medications manufactured and distributed by Torrent, Camber, and Hetero;

5.     All communications with customers involving complaints or comments concerning the valsartan-containing medications manufactured and distributed by Torrent, Camber, and Hetero;

6.     All documents concerning communications with any retailer involved in the marketing or sale of valsartan-containing medications manufactured and distributed by Torrent, Camber, and Hetero;

7.     All documents concerning communications with federal or state regulators; and

8.     All documents concerning the total revenue derived from sales of valsartan-containing medication.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter.  If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Very truly yours,

Andrew J. Obergfell